Daniel Srourian (SBN 285678)
**SROURIAN LAW FIRM, P.C.**
468 N Camden Drive, Suite 200
Beverly Hills, CA 90210
Tel: (213) 474-3800
E: daniel@slfla.com

Grayson Wells (*pro hac vice* forthcoming)
**STRANCH, JENNINGS & GARVEY, PLLC**
The Freedom Center
223 Rosa L. Parks Avenue, Suite 200
Nashville, Tennessee 37203
Tel: (615) 254-8801
gwells@stranchlaw.com

*Attorneys for Plaintiff and the Proposed Class*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| CRISTINA DESTEFANO, individually and on behalf of all others similarly situated,<br>Plaintiff,<br>v.<br>REVOLVE GROUP, INC.,<br>Defendant. | Case No. 2:26-cv-13350<br>**CLASS ACTION COMPLAINT FOR:**<br>1. Negligence;<br>2. Negligence *Per Se*;<br>3. Breach of Implied Contract; and<br>4. Unjust Enrichment<br>**DEMAND FOR JURY TRIAL** |

Plaintiff Cristina DeStefano ("Plaintiff"), individually and on behalf of all others similarly situated ("Class Members"), brings this Class Action Complaint against Defendant Revolve Group, Inc. for its failure to properly secure and safeguard Plaintiff's and Class Members' personally identifiable information ("PII" or "Private Information") stored within Defendant's information network. Plaintiff alleges the following on personal knowledge as to herself and her own experiences and, as to all other matters, on information and belief, including the investigation of counsel.

## JURISDICTION AND VENUE

1. This Court has subject-matter jurisdiction over this action under the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5,000,000, exclusive of interest and costs; the proposed Class contains more than 100 members; and at least one member of the proposed Class, including Plaintiff, a citizen of Nevada, is a citizen of a State different from Defendant, a citizen of Delaware and California. The Court has supplemental jurisdiction over any claims not within its original jurisdiction under 28 U.S.C. § 1367(a).

2. On information and belief, fewer than two-thirds of the members of the proposed Class are citizens of California, and no exception to CAFA jurisdiction applies.

3. This Court has general personal jurisdiction over Defendant because Defendant maintains its principal place of business in Cerritos, California, within this District. Defendant is therefore at home in California. On information and belief, Defendant also made the decisions about the data-security practices at issue in this action in California.

4. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) because Defendant resides in this District, and under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to Plaintiff's claims, including Defendant's data-security decisions, occurred in this District.

## NATURE OF THE ACTION

5. Defendant Revolve Group, Inc. ("Revolve" or "Defendant") operates the online fashion retailers Revolve.com and FWRD.com. To make purchases, Revolve's customers must provide their Private Information, including their names, addresses, contact information, payment card numbers, and payment card expiration dates. Revolve invites its customers to save their

payment card information to their online shopping accounts, and it keeps that Private Information on its systems.

6. PII generally includes information that can be used to distinguish or trace an individual's identity, as well as identifiers that do not on their face name an individual but that are particularly sensitive or valuable in the wrong hands, such as financial account and payment card numbers.

7. On September 11, 2026, an unauthorized actor accessed Revolve's online shopping platform. According to Revolve's own filing with the U.S. Securities and Exchange Commission ("SEC"), the actor "may have obtained, through automated means, the name, contact information, payment card number and payment card expiration date for certain customers who saved payment information associated with their online shopping account on the Company's e-commerce platform" (the "Data Breach").[1]

8. Revolve determined by September 29, 2026, exactly what customer data the Data Breach involved. It then waited another thirty days, until October 29, 2026, to begin notifying affected customers.[2] By then, the stolen card data had been in criminal hands for forty-eight days.

9. The Data Breach is large. Breach notices that Revolve filed with regulators in just five States (Texas, Massachusetts, South Carolina, Iowa, and Vermont) cover 197,072 people, and news reports indicate that as many as 1,515,073 people were affected nationwide.[3]

---

[1] Revolve Grp., Inc., Current Report (Form 8-K) (Oct. 29, 2026), https://www.sec.gov/Archives/edgar/data/1746618/000119312526439022/rvlv-20261029.htm.

[2] Letter from Revolve Grp., Inc. to Cristina DeStefano (Oct. 29, 2026) (on file with counsel) [hereinafter Notice Letter].

[3] *Revolve Data Breach Exposed Shoppers' Saved Card Numbers and Expiration Dates*, WTAE (Nov. 4, 2026), https://www.wtae.com/article/revolve-data-breach-exposed-shoppers-saved-card-numbers-and-expiration-dates/74334001.

10. The method of the attack matters. That an unauthorized actor could extract full payment card numbers from a consumer-facing shopping platform "through automated means" indicates, on information and belief, that Revolve stored full card numbers in a form retrievable through that platform. It also indicates that Revolve failed to deploy basic, widely available controls, such as bot detection, rate limiting, multi-factor authentication, and the masking or tokenization of stored card numbers, that would have stopped or quickly detected automated extraction.

11. Revolve promised its customers better. It told them that "REVOLVE is committed to maintaining the highest levels of security and protection against fraud," and that it "stay[s] up-to-date with the latest in security technologies to ensure that your credit card information, contact information and shipping/billing information are confidential and safe."[4]

12. After the Data Breach, Revolve offered its customers no credit monitoring, no identity-protection services, and no reimbursement for the costs of protecting themselves. It instead told them that "[i]t is always advisable to review your payment card statements for any unauthorized charges."[5] Revolve thus shifted the burden and expense of its security failures onto its customers.

13. Plaintiff Cristina DeStefano, a Nevada resident whose name, address, payment card number, and card expiration date were compromised in the Data Breach, brings this action on behalf of a nationwide class of similarly situated individuals. Plaintiff seeks damages, restitution, and injunctive relief requiring Revolve to secure the Private Information it continues to hold.

---

[4] *Payment*, Revolve, https://www.revolve.com/payment (last visited Nov. 11, 2026).

[5] Notice Letter, *supra* note 2, at 1.

## PARTIES

14. Plaintiff Cristina DeStefano is a natural person and a citizen of the State of Nevada who resides in Las Vegas, Clark County, Nevada. Plaintiff is a Revolve customer who saved payment card information to her Revolve online shopping account. Plaintiff received a notice letter from Revolve dated October 29, 2026, informing Plaintiff that her name, address, payment card number, and payment card expiration date were involved in the Data Breach.

15. Defendant Revolve Group, Inc. is a Delaware corporation with its principal place of business at 12889 Moore Street, Cerritos, California 90703. Revolve operates the Revolve.com and FWRD.com e-commerce platforms and sells apparel, footwear, accessories, and beauty products to consumers throughout the United States, including in Nevada. Revolve is a publicly traded company that files reports with the SEC.

16. Revolve is registered with the California Secretary of State as an out-of-state stock corporation. Its registered agent for service of process in California is Telos Legal Corp., a registered corporate agent under California Corporations Code section 1505, located at 1818 11th Street, Suite 101, Sacramento, California 95811. The Telos Legal Corp. employees authorized to accept service of process on Revolve's behalf are Maya Bradford, Rian Michele Hollowell, and Sebastian Camua, each at that address. Revolve may be served with process by delivering the summons and complaint to its registered agent under Federal Rule of Civil Procedure 4(h)(1)(B).

## FACTUAL ALLEGATIONS

### A. Revolve Collects and Stores Its Customers' Payment Card Information.

17. Revolve sells its products online, through its Revolve.com and FWRD.com websites and associated mobile applications, to consumers across the United States.

18. To complete a purchase, a Revolve customer must provide Revolve with, among other things, the customer's name, billing and shipping addresses, contact information, payment card number, and payment card expiration date.

19. Revolve permits customers to save their payment card information to their online shopping accounts. When a customer does so, Revolve stores the customer's payment card number and expiration date, along with the customer's name and address, on Revolve's systems.

20. Revolve benefits from storing its customers' payment card information. On information and belief, saved payment information makes repeat purchases faster and easier and thereby increases Revolve's sales.

21. Revolve knew that its customers would not provide, or allow Revolve to store, their payment card information unless they trusted Revolve to protect it. Revolve therefore made express representations about the security of that information. On its website, Revolve represents:

> REVOLVE is committed to maintaining the highest levels of security and protection against fraud. We stay up-to-date with the latest in security technologies to ensure that your credit card information, contact information and shipping/billing information are confidential and safe.[6]

22. Revolve further represents that "[a]ll transactions submitted to us are encrypted with 128 SSL software."[7] That representation addresses only the transmission of data. Revolve did not disclose that the payment card

---

[6] *Payment*, *supra* note 4.
[7] *Id.*

information it stored after a transaction could be extracted from its platform through automated means.

23. Plaintiff and Class Members reasonably understood from Revolve's representations that Revolve would protect the payment card information it stored using security measures consistent with, at minimum, applicable law and industry standards.

24. Plaintiff and Class Members took reasonable steps to maintain the confidentiality of their Private Information. They relied on Revolve to keep their Private Information confidential and securely maintained, to use it for business purposes only, and to make only authorized disclosures of it.

**B. The Data Breach.**

25. On September 11, 2026, an unauthorized actor accessed Revolve's online shopping platform.[8]

26. On October 29, 2026, Revolve filed a Current Report on Form 8-K with the SEC disclosing that it "recently became aware of unauthorized access to certain of its systems."[9] Revolve stated that, "[b]ased on its investigation, the Company believes that an unauthorized actor may have obtained, through automated means, the name, contact information, payment card number and payment card expiration date for certain customers who saved payment information associated with their online shopping account on the Company's e-commerce platform."[10]

27. Revolve stated that it "notified federal law enforcement authorities and engaged leading external cybersecurity experts."[11] Revolve has not disclosed how the unauthorized actor gained access to its platform,

---

[8] Notice Letter, *supra* note 2, at 1.
[9] Revolve Grp., Inc., *supra* note 1.
[10] *Id.*
[11] *Id.*

how long the actor maintained access, whether customer account credentials were also compromised, or why full payment card numbers could be retrieved from its platform at all.

28. As a result, Plaintiff and Class Members remain in the dark about how their Private Information was taken, where it has ended up, who has used it and for what purposes, and what steps Revolve is taking to secure their Private Information going forward.

29. Revolve's notice letters state that Revolve "determined" on September 29, 2026, that the compromised data included the recipient's "name and address, as well as the card number and expiration date for [the recipient's] payment card(s)."[12] Revolve did not begin mailing those letters until October 29, 2026, thirty days after that determination and forty-eight days after the Data Breach.[13]

30. Breach notices Revolve filed with state regulators report that the Data Breach affected 127,200 Texas residents;[14] 46,813 Massachusetts residents;[15] 17,813 South Carolina residents;[16] 3,918 Iowa residents;[17] and

[12] Notice Letter, *supra* note 2, at 1.

[13] Letter from Pierce T. Cox, Counsel for Revolve Grp., Inc., to Consumer Prot. Div., Off. of the Att'y Gen. of Iowa (Oct. 29, 2026) (on file with counsel) [hereinafter Iowa Notice].

[14] Tex. Att'y Gen., *Data Security Breach Reports*, https://oag.my.site.com/datasecuritybreachreport/apex/DataSecurityReportsPage (last visited Nov. 11, 2026).

[15] Mass. Off. of Consumer Affs. & Bus. Regul., *2026 Data Breach Notification Report* 189 (Nov. 10, 2026) (entry No. 2026-1895).

[16] S.C. Dep't of Consumer Affs., *Security Breach Notices*, https://consumer.sc.gov/identity-theft-unit/security-breach-notices (last visited Nov. 11, 2026).

[17] Iowa Notice, *supra* note 13, at 1.

1,328 Vermont residents,[18] a total of 197,072 people in those five States alone. Revolve also submitted a sample notice to the California Attorney General, which California law requires when a business sends a breach notice to more than 500 California residents.[19] According to news reports, the breach data maintained by the Texas Attorney General also includes a separate field listing 1,515,073 people affected nationwide.[20] Revolve has not publicly disclosed the total number of affected individuals.

31. Revolve's notice letters offered no credit monitoring, identity-theft protection, or reimbursement. Instead, the letters advised recipients that "[i]t is always advisable to review your payment card statements for any unauthorized charges" and to report any such charges to their card issuers.[21]

32. In its Form 8-K, Revolve told investors that it "does not believe this incident will have a material impact on its business."[22] The harm of the Data Breach instead falls on Revolve's customers.

**C. Revolve Failed to Meet Industry Standards and Its Legal Obligations.**

33. The Payment Card Industry Data Security Standard ("PCI DSS") is the security standard that the major payment card brands require of

---

[18] Vt. Att'y Gen., *Security Breach Notices*, https://ago.vermont.gov/categories/security-breach-notices (last visited Nov. 11, 2026).

[19] *See* Cal. Civ. Code § 1798.82(f) (West); Revolve Grp., Inc., Notice of Data Breach (sample consumer notice submitted to the Cal. Att'y Gen.) (on file with counsel).

[20] *Revolve Data Breach Exposed Shoppers' Saved Card Numbers and Expiration Dates*, *supra* note 3.

[21] Notice Letter, *supra* note 2, at 1.

[22] Revolve Grp., Inc., *supra* note 1.

merchants that accept payment cards.[23] On information and belief, Revolve, as a merchant that accepts payment cards, is contractually obligated to comply with the PCI DSS.

34. The PCI DSS requires merchants, among other things, to protect stored account data, including by rendering primary account numbers unreadable wherever they are stored and by limiting the display of primary account numbers (Requirement 3); to identify users and authenticate access to system components (Requirement 8); to log and monitor all access to system components and cardholder data (Requirement 10); and to test the security of systems and networks regularly (Requirement 11).[24]

35. Section 5 of the Federal Trade Commission Act ("FTC Act") prohibits "unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C. § 45(a)(1). The Federal Trade Commission ("FTC") has long treated a business's failure to employ reasonable data-security measures as an unfair practice under Section 5, and courts have upheld that authority. *See FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236, 244–49 (3d Cir. 2015).

36. The FTC's published guidance for businesses instructs them, among other things, to keep only the personal information they need, to protect the information they keep, to properly dispose of information they no longer need, to monitor their systems for signs of unauthorized access, and to have a plan in place to respond to security incidents.[25]

---

[23] PCI Sec. Standards Council, *Payment Card Industry Data Security Standard: Requirements and Testing Procedures* (ver. 4.0.1, June 2024), https://www.pcisecuritystandards.org/document_library/.

[24] *Id.*

[25] Fed. Trade Comm'n, *Protecting Personal Information: A Guide for Business* (2016), https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business.

37. Revolve owed Plaintiff and Class Members duties to, among other things:

(a) exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the Private Information in its possession from being compromised, lost, stolen, accessed, or misused by unauthorized persons;

(b) design, maintain, and test its computer systems, servers, and networks to ensure that Private Information was adequately secured and protected;

(c) implement processes that would detect a breach of its data-security systems in a timely manner;

(d) act on data-security warnings and alerts in a timely fashion;

(e) monitor user behavior and activity on its platform to identify possible threats; and

(f) disclose if its computer systems and data-security practices were inadequate to safeguard Private Information, because that inadequacy would be material to customers' decisions to entrust their Private Information to Revolve.

38. The widely publicized wave of data breaches in recent years put Revolve on notice of the need to protect the Private Information it stored. Despite these warnings, Revolve failed to take appropriate steps to protect Plaintiff's and Class Members' Private Information from being compromised.

39. Automated attacks on e-commerce platforms, including credential-stuffing attacks and automated scraping of account data, are well known in the retail industry. Revolve, a large online retailer that stores

payment card information for its customers, knew or should have known that its platform was a target for such attacks.

40. On information and belief, Revolve failed to implement reasonable security measures consistent with the PCI DSS and the FTC's guidance, including by:

(a) failing to render stored payment card numbers unreadable, through tokenization, truncation, or encryption, so that full card numbers could not be retrieved through its consumer-facing platform;

(b) failing to deploy bot detection, rate limiting, and similar controls to detect and block automated access to customer accounts and stored payment information;

(c) failing to require multi-factor or step-up authentication before allowing access to, or use of, stored payment information;

(d) failing to log and monitor access to its systems sufficiently to detect the automated extraction of customer data promptly;

(e) retaining full payment card numbers in a form, or for a period, not reasonably necessary for its business purposes; and

(f) failing to test its systems adequately for the vulnerabilities that the unauthorized actor exploited.

41. The Data Breach was the direct and foreseeable result of these failures.

42. Revolve is a sophisticated, publicly traded company with the resources to deploy robust cybersecurity protocols. It knew, or should have known, that those protocols were necessary to fulfill its duties to Plaintiff and

Class Members. Its failure to deploy them was therefore willful, reckless, or, at a minimum, grossly negligent.

**D. The Data Breach Harmed Plaintiff and Class Members.**

43. The data stolen in the Data Breach, a cardholder's name, billing address, card number, and expiration date, is the information used to make card-not-present purchases. On information and belief, many online merchants do not require a card security code, and a matching billing address allows fraudulent transactions to pass address-verification checks.

44. The stolen data also exposes Plaintiff and Class Members to targeted phishing. A criminal who knows a victim's name, address, and the card the victim used at Revolve can impersonate Revolve, a card issuer, or a bank convincingly enough to extract additional information, such as card security codes, account credentials, or Social Security numbers.

45. Private Information is a valuable commodity for which a "cyber black market" exists in which criminals openly post stolen payment card numbers, Social Security numbers, and other personal information on several underground internet websites.

46. Numerous sources cite dark web pricing for stolen identity credentials. For example, personal information can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[26] Experian reports that stolen credit card details can sell for $10 to $240 on the dark web.[27]

---

[26] Anita George, *Your Personal Data Is for Sale on the Dark Web. Here's How Much It Costs*, Digital Trends (Oct. 16, 2019), https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/.

[27] Ben Luthi, *Here's What Your Data Sells for on the Dark Web*, Experian (June 30, 2025), https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/.

47. Stolen payment card data is bought and sold on these illicit markets for use in fraud. Plaintiff and Class Members have lost control over their Private Information and the ability to decide how and with whom it is shared.

48. On information and belief, the unauthorized actor accessed Plaintiff's and Class Members' Private Information with the intent to misuse it, including by selling it to other criminals.

49. The harm from a data breach can also surface long after the breach itself. As the U.S. Government Accountability Office has explained:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[28]

50. To protect themselves, Plaintiff and Class Members must cancel and replace their compromised payment cards; update the card information associated with recurring payments, subscriptions, and digital wallets; monitor their financial accounts for unauthorized activity; and remain alert for phishing attempts. Each of these steps costs time and, for many Class Members, money.

51. Had Revolve disclosed that its platform permitted the automated extraction of stored payment card numbers, Plaintiff and Class Members

---

[28] U.S. Gov't Accountability Off., GAO-07-737, *Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown* 29 (2007).

would not have saved their payment card information with Revolve or would not have shopped with Revolve on the same terms.

52. As a direct and proximate result of the Data Breach, Plaintiff and Class Members have suffered and will continue to suffer injury, including (a) the compromise and theft of their Private Information; (b) out-of-pocket costs and lost time spent on reasonable mitigation; (c) the disruption caused by card cancellation and replacement; (d) an increased and substantial risk of fraud and targeted phishing; (e) the loss of the benefit of their bargain with Revolve; (f) the diminished value of their Private Information; and (g) the continued risk to their Private Information, which remains in Revolve's possession and subject to Revolve's inadequate security.

## PLAINTIFF DESTEFANO'S EXPERIENCE

53. Plaintiff has been a Revolve customer for approximately five years and has made purchases through Revolve.com throughout that time.

54. To make those purchases, Plaintiff provided Revolve with her name, address, contact information, payment card number, and payment card expiration date. Plaintiff saved that payment card information to her Revolve online shopping account.

55. Plaintiff relied on Revolve to keep her Private Information secure. Had Plaintiff known that Revolve's platform permitted the automated extraction of stored payment card numbers, Plaintiff would not have saved her payment card information with Revolve or would not have shopped with Revolve.

56. Plaintiff received by mail a notice letter from Revolve dated October 29, 2026. The letter informed Plaintiff that the data involved in the Data Breach contained her "name and address, as well as the card number and expiration date for [her] payment card(s)." The letter offered Plaintiff no credit monitoring, identity protection, or reimbursement.

57. In response to the Data Breach, Plaintiff contacted her card issuer, cancelled the compromised payment card, and obtained a replacement card. Plaintiff then updated the payment information for the accounts and recurring payments linked to the compromised card.

58. Plaintiff has spent several hours responding to the Data Breach, including reviewing the notice letter, contacting her card issuer, replacing the compromised card, updating linked accounts, reviewing account statements for unauthorized activity, and fielding the fraudulent calls described below. Plaintiff spent this time at Revolve's direction and as a reasonable response to the Data Breach, time Plaintiff otherwise would have spent on work or other activities.

59. Plaintiff continues to monitor her financial accounts and will need to continue doing so for the foreseeable future.

60. Since the Data Breach on September 11, 2026, Plaintiff has received a series of unsolicited telephone calls from callers trying to obtain her Social Security number. Plaintiff does not recall receiving calls of this kind before the Data Breach.

61. The calls follow the same pattern. The caller speaks politely, gives a name, and tells Plaintiff that the call concerns her Social Security benefits. The caller then asks Plaintiff for her Social Security number in order to discuss those benefits.

62. Plaintiff hangs up on these calls immediately because she knows that the Social Security Administration would not call her to ask for her Social Security number.

63. On information and belief, these calls are targeted phishing attempts made possible by the Data Breach. Revolve has disclosed that the unauthorized actor may have obtained customers' names and "contact

information,"[29] and Plaintiff provided her contact information, including her telephone number, to Revolve. Criminals use stolen names and contact information to make impersonation calls appear legitimate and to obtain more sensitive information, such as Social Security numbers, that can be used to commit identity theft.

64. The calls have cost Plaintiff time and require her to remain on guard against fraud whenever her phone rings. They also expose her to a continuing risk that a future caller will succeed in obtaining her Social Security number or other sensitive information.

65. Plaintiff was also injured by the material risk of future harm she faces based on Defendant's Data Breach. This risk is imminent and substantial because Plaintiff's Private Information has been exposed in the Data Breach; that Private Information, including her name, address, and payment card information, is highly sensitive and presents a high risk of identity theft or fraud; and it is likely, given Defendant's clientele, that some of the Class's Private Information that has been exposed has already been misused.

66. Plaintiff suffered actual injury in the form of damages to and diminution in the value of her Private Information—a form of intangible property that she entrusted to Defendant, which was compromised in and as a result of the Data Breach.

67. Plaintiff has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from her Private Information being placed in the hands of unauthorized third parties and criminals.

---

[29] Revolve Grp., Inc., *supra* note 1.

68. As a result of the Data Breach, Plaintiff has increased anxiety over her loss of privacy and over the impact of cybercriminals accessing, using, and selling her Private Information.

69. Plaintiff has a continuing interest in ensuring that her Private Information, which, on information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

## CLASS ACTION ALLEGATIONS

70. Plaintiff brings this action under Federal Rules of Civil Procedure 23(a), 23(b)(2), 23(b)(3), and 23(c)(4), on behalf of the following class:

> All individuals residing in the United States whose Private Information was accessed or acquired in the Data Breach, including all individuals to whom Revolve sent notice of the Data Breach (the "Class").

71. Excluded from the Class are Defendant; its officers, directors, and employees; any entity in which Defendant has a controlling interest; Defendant's legal representatives, successors, and assigns; any federal, state, or local government entity; all individuals who timely and validly request exclusion from the Class; and the judicial officers assigned to this action and their immediate families and staff.

72. Plaintiff reserves the right to modify the class definition, or to propose subclasses, as discovery and further investigation warrant.

73. *Numerosity*. Fed. R. Civ. P. 23(a)(1). The Class Members are so numerous that joinder of all of them is impracticable. Revolve's own breach notices cover at least 197,072 people, and news reports indicate that as many as 1,515,073 people were affected nationwide.

74. *Ascertainability*. Class Members can be identified from Revolve's own records, including the records Revolve used to send notice of the Data Breach.

75. *Commonality and Predominance*. Fed. R. Civ. P. 23(a)(2), (b)(3). This action involves questions of law and fact common to the Class that predominate over any individual questions, including:

(a) whether Revolve owed Plaintiff and Class Members a duty to use reasonable care to secure their Private Information;

(b) whether Revolve's data-security measures were reasonable in light of applicable law and industry standards, including the PCI DSS and the FTC Act;

(c) whether Revolve stored full payment card numbers in a form retrievable through its platform;

(d) whether Revolve knew or should have known that its data-security systems were susceptible to a data breach;

(e) whether Revolve's failure to implement adequate data-security measures allowed the Data Breach to occur;

(f) whether Revolve breached its duties to Plaintiff and Class Members;

(g) how and when Revolve learned of the Data Breach;

(h) whether Revolve has adequately addressed and fixed the vulnerabilities that permitted the Data Breach to occur;

(i) whether Revolve unreasonably delayed notifying Plaintiff and Class Members of the Data Breach;

(j) whether Revolve's representations about its data security were false, misleading, or likely to deceive;

(k) whether Revolve entered into, and breached, implied contracts with Plaintiff and Class Members;

(l) whether Revolve was unjustly enriched;

(m) whether Plaintiff and Class Members are entitled to damages, restitution, or other monetary relief, and in what amount; and

(n) whether Plaintiff and Class Members are entitled to injunctive relief.

76. *Typicality*. Fed. R. Civ. P. 23(a)(3). Plaintiff's claims are typical of the claims of the Class. Plaintiff and every Class Member had Private Information compromised in the same Data Breach, as a result of the same security failures, and assert claims arising from the same course of conduct.

77. *Adequacy*. Fed. R. Civ. P. 23(a)(4). Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff has no interests antagonistic to those of the Class and has retained counsel experienced in data-breach and consumer class action litigation. Plaintiff is not subject to any individual defenses unique from those applicable to other Class Members, and Plaintiff anticipates no unusual difficulties in managing this action as a class action.

78. *Superiority*. Fed. R. Civ. P. 23(b)(3). A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The damages suffered by each Class Member are small relative to the cost of individual litigation against a well-resourced defendant. Individual actions would risk inconsistent judgments, which could as a practical matter dispose of the interests of absent Class Members, and would burden the courts with duplicative litigation.

79. *Injunctive Relief*. Fed. R. Civ. P. 23(b)(2). Revolve has acted or refused to act on grounds that apply generally to the Class, including by failing to secure the Private Information of all Class Members, so that final injunctive relief is appropriate for the Class as a whole. Unless a Class-wide injunction

issues, Revolve may continue to fail to properly secure the Private Information of Class Members.

80. *Particular Issues*. Fed. R. Civ. P. 23(c)(4). In the alternative, particular issues, including those listed above, are appropriate for class treatment because their resolution would materially advance the disposition of this action.

**COUNT I**
**NEGLIGENCE**
(On Behalf of Plaintiff and the Class)

81. Plaintiff incorporates by reference the above allegations as if fully set forth herein.

82. At all relevant times, Revolve owed Plaintiff and Class Members a duty to act with reasonable care to secure and safeguard their Private Information and to use commercially reasonable methods to do so. Revolve took on this duty when it required Plaintiff and Class Members to provide their Private Information to make purchases, invited them to let Revolve store their payment card information, and accepted and stored that Private Information on its systems.

83. Among other things, Revolve's duty required it:

(a) to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the Private Information in its possession;

(b) to protect Plaintiff's and Class Members' Private Information using reasonable and adequate security procedures and systems that comply with industry standards, including the PCI DSS;

(c) to protect stored payment card numbers from automated extraction through its consumer-facing platform,

including through tokenization or encryption, bot detection, rate limiting, and multi-factor authentication;

(d) to implement processes to detect a data breach quickly and to act on warnings about data breaches in a timely manner; and

(e) to notify Plaintiff and Class Members promptly of any data breach, security incident, or intrusion that affected or may have affected their Private Information.

84. Revolve's duty arose from, among other things, the foreseeable risk that inadequately protected payment card data would be stolen and misused; Revolve's superior knowledge of and exclusive control over its own systems; Revolve's representations about its data security; and the standards of care reflected in the PCI DSS and Section 5 of the FTC Act.

85. Revolve knew that the Private Information it stored was private and confidential and should be protected as such. Revolve therefore owed Plaintiff and Class Members a duty not to subject them to an unreasonable risk of harm, because they were the foreseeable and probable victims of any inadequate security practices.

86. Revolve knew, or should have known, of the risks inherent in collecting and storing Private Information, the vulnerabilities of its data-security systems, and the importance of adequate security. Revolve also knew of the numerous, well-publicized data breaches in recent years and of the prevalence of automated attacks against e-commerce platforms.

87. Because Revolve knew that a breach of its systems could harm hundreds of thousands of people, including Plaintiff and Class Members, it had a duty to adequately protect its systems and the Private Information stored on them.

88. Plaintiff's and Class Members' willingness to entrust Revolve with their Private Information depended on the understanding that Revolve would take adequate security precautions. Only Revolve was in a position to ensure that its systems and protocols were sufficient to protect that Private Information from attack. Revolve therefore had a special relationship with Plaintiff and Class Members.

89. Revolve's duties arose from the common law and from Section 5 of the FTC Act, independently of any contract between Revolve and Plaintiff or Class Members.

90. Revolve breached its duties to Plaintiff and Class Members in ways that include, but are not limited to, the failures described in paragraph 40 and the following:

(a) failing to provide fair, reasonable, or adequate computer systems and data-security practices to safeguard Plaintiff's and Class Members' Private Information;

(b) storing full payment card numbers in a form that could be retrieved through its consumer-facing platform, rather than rendering them unreadable through tokenization, truncation, or encryption;

(c) allowing unmonitored and unrestricted automated access to stored Private Information by failing to deploy bot detection, rate limiting, multi-factor authentication, and similar controls;

(d) failing to implement processes to detect data breaches, security incidents, or intrusions quickly, and failing to monitor user behavior and activity on its platform to identify possible threats;

(e) retaining full payment card numbers longer than, and in a form beyond what, was reasonably necessary for its business purposes;

(f) failing to comply with the PCI DSS and to consistently enforce security policies aimed at protecting Plaintiff's and Class Members' Private Information; and

(g) failing to disclose the Data Breach to Plaintiff and Class Members in a timely and accurate manner.

91. Revolve's failure to meet these duties was wrongful, reckless, and grossly negligent in light of the foreseeable risks and known threats.

92. Revolve also had an affirmative duty to disclose the unauthorized access to and theft of the Private Information to Plaintiff and Class Members in a timely manner, so that they could take appropriate measures to mitigate their damages, protect against adverse consequences, and thwart future misuse of their Private Information.

93. Revolve breached that duty. It waited thirty days after determining what data had been compromised, and forty-eight days after the Data Breach, before notifying Plaintiff and Class Members. To date, Revolve has not disclosed how the unauthorized actor gained access to its platform, how long the actor maintained access, or whether customer account credentials were also compromised. Revolve's delayed and incomplete notice limited Plaintiff's and Class Members' ability to assess the extent of their exposure and to take meaningful, proactive steps to protect their Private Information.

94. There is a close causal connection between Revolve's failure to implement reasonable security measures and the harm Plaintiff and Class Members have suffered and the imminent risk of harm they face. Plaintiff's and Class Members' Private Information was accessed and stolen as the direct

and proximate result of Revolve's failure to exercise reasonable care in safeguarding it.

95. As a direct and proximate result of Revolve's negligence, Plaintiff and Class Members have suffered and will continue to suffer injury, including:

(a) the compromise and theft of their Private Information;

(b) the loss of control over how their Private Information is used;

(c) out-of-pocket expenses associated with preventing, detecting, and recovering from fraud and unauthorized use of their Private Information, including the replacement of compromised payment cards;

(d) lost time and productivity spent addressing and attempting to mitigate the actual and future consequences of the Data Breach;

(e) an increased and substantial risk of fraud, identity theft, and targeted phishing;

(f) the continued risk to their Private Information, which remains in Revolve's possession and is subject to further unauthorized disclosure so long as Revolve fails to adopt adequate security measures; and

(g) future costs in time, effort, and money that will be needed to prevent, detect, contest, and repair the consequences of the Data Breach.

96. As a further direct and proximate result of Revolve's negligence, Plaintiff and Class Members have suffered anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

97. Plaintiff and Class Members are entitled to compensatory and nominal damages in an amount to be proven at trial.

**COUNT II**
**NEGLIGENCE PER SE**
(On Behalf of Plaintiff and the Class)

98. Plaintiff incorporates by reference the above allegations as if fully set forth herein.

99. Section 5 of the FTC Act, 15 U.S.C. § 45(a)(1), prohibits "unfair or deceptive acts or practices in or affecting commerce." As interpreted and enforced by the FTC, Section 5 prohibits businesses from failing to use reasonable measures to protect consumers' personal and financial information.

100. The FTC has repeatedly brought enforcement actions against businesses that failed to protect consumers' personal information, and courts have upheld the FTC's authority to treat inadequate data security as an unfair practice under Section 5. *See Wyndham*, 799 F.3d at 244–49. The FTC's published guidance and enforcement orders further inform the scope of Revolve's obligations under Section 5.

101. Revolve is an entity covered by Section 5. It sells products to consumers in interstate commerce, and it collects, stores, and uses consumers' Private Information in connection with those sales.

102. Revolve violated Section 5 of the FTC Act by failing to use reasonable measures to protect Plaintiff's and Class Members' Private Information and by failing to comply with applicable industry standards, including the PCI DSS, as described in detail above. Among other things, Revolve stored full payment card numbers in a form retrievable through its consumer-facing platform and failed to deploy controls that would have stopped or detected their automated extraction.

103. Revolve's conduct was particularly unreasonable given the nature and amount of Private Information it obtained and stored, including the full payment card numbers of hundreds of thousands of customers, and the foreseeable consequences of a data breach for Plaintiff and Class Members.

104. Revolve's violation of Section 5 of the FTC Act constitutes negligence *per se*.

105. Plaintiff and Class Members are within the class of persons Section 5 of the FTC Act was designed to protect. As consumers who provided their Private Information to Revolve in connection with their purchases, they are the very people whom the statute's prohibition on unfair practices protects.

106. The harm Plaintiff and Class Members suffered as a result of the Data Breach is the type of harm Section 5 of the FTC Act was intended to prevent. The FTC has pursued enforcement actions against businesses whose failure to employ reasonable data-security measures caused the same kind of harm that Plaintiff and Class Members have suffered.

107. Revolve's violation of Section 5 of the FTC Act was a direct and proximate cause of the Data Breach and of the injuries Plaintiff and Class Members suffered. But for Revolve's failure to use reasonable data-security measures, the unauthorized actor would not have been able to obtain Plaintiff's and Class Members' Private Information through automated means.

108. As a direct and proximate result of Revolve's negligence *per se*, Plaintiff and Class Members have suffered and will continue to suffer the injuries described above, including the compromise and theft of their Private Information; out-of-pocket costs and lost time spent responding to the Data Breach; an increased and substantial risk of fraud, identity theft, and targeted phishing; anxiety, emotional distress, and loss of privacy; and the continued risk to their Private Information in Revolve's possession.

109. Plaintiff and Class Members are entitled to compensatory and nominal damages in an amount to be proven at trial.

**COUNT III**
**BREACH OF IMPLIED CONTRACT**
(On Behalf of Plaintiff and the Class)

110. Plaintiff incorporates by reference the above allegations as if fully set forth herein.

111. Through their course of conduct, Revolve, Plaintiff, and Class Members entered into implied contracts under which Revolve agreed to implement data security adequate to safeguard and protect the privacy of Plaintiff's and Class Members' Private Information.

112. Revolve required Plaintiff and Class Members to provide and entrust their Private Information as a condition of purchasing products from Revolve. Revolve also solicited and invited Plaintiff and Class Members to save their payment card information to their online shopping accounts as part of its regular business practices.

113. Plaintiff and Class Members accepted Revolve's offers by providing their Private Information to Revolve, by allowing Revolve to store their payment card information, and by paying for Revolve's products.

114. In so doing, Plaintiff and Class Members entered into implied contracts with Revolve under which Revolve agreed, among other things:

(a) to safeguard and protect Plaintiff's and Class Members' Private Information;

(b) to keep that Private Information secure and confidential;

(c) to use reasonable security measures consistent with applicable law and industry standards, including the PCI DSS;

(d) to use that Private Information for business purposes only and to make only authorized disclosures of it; and

(e) to notify Plaintiff and Class Members in a timely and accurate manner if their Private Information was breached, compromised, or stolen.

115. Revolve's representations, including its promise that it was "committed to maintaining the highest levels of security and protection against fraud" and that it would keep customers' "credit card information, contact information and shipping/billing information . . . confidential and safe," confirmed and informed the terms of those implied contracts.

116. A meeting of the minds occurred when Plaintiff and Class Members agreed to, and did, provide their Private Information to Revolve in exchange for, among other things, the protection of that Private Information.

117. Plaintiff and Class Members would not have provided their Private Information to Revolve, or allowed Revolve to store their payment card information, without Revolve's implied promise to protect it. Reasonable consumers would not entrust their payment card information to a retailer that did not intend to safeguard it.

118. Plaintiff and Class Members fully performed their obligations under the implied contracts, including by providing their Private Information and paying for Revolve's products.

119. Revolve breached the implied contracts by, among other things:

(a) failing to implement and maintain reasonable security measures to safeguard and protect Plaintiff's and Class Members' Private Information, including the measures described in paragraph 40;

(b) failing to comply with industry standards, including the PCI DSS;

(c) allowing an unauthorized actor to obtain Plaintiff's and Class Members' Private Information through automated means; and

(d) failing to provide timely and accurate notice that their Private Information had been compromised in the Data Breach.

120. As a direct and proximate result of Revolve's breaches of the implied contracts, Plaintiff and Class Members have suffered and will continue to suffer (a) an ongoing, imminent, and impending threat of fraud, identity theft, and targeted phishing, resulting in monetary loss and economic harm; (b) the loss of the confidentiality of their Private Information; (c) out-of-pocket costs and lost time spent responding to the Data Breach, including replacing compromised payment cards; (d) the loss of the benefit of their bargain with Revolve; and (e) other economic and non-economic harm.

121. Plaintiff and Class Members are entitled to compensatory, consequential, and nominal damages in an amount to be proven at trial.

**COUNT IV**
**UNJUST ENRICHMENT**
(On Behalf of Plaintiff and the Class)

122. Plaintiff incorporates by reference the above allegations as if fully set forth herein, and pleads this Count in the alternative to Count III, to the extent the Court finds that no enforceable contract governs the subject matter at issue.

123. Plaintiff and Class Members conferred benefits on Revolve in the form of payments for its products and the Private Information that Revolve used to facilitate and increase its sales.

124. Revolve knew of and appreciated these benefits. On information and belief, a portion of the revenue Revolve received from Plaintiff and Class

Members was intended to pay for, and should have been used for, reasonable data security.

125. Before and at the time Plaintiff and Class Members entrusted their Private Information to Revolve, Revolve caused them to reasonably believe that it would keep that Private Information secure, including through its representations that it maintained "the highest levels of security" and kept customers' credit card information "confidential and safe."

126. Revolve knew, or should have known, that reasonable consumers would want their Private Information kept secure and would not have purchased from Revolve, or saved their payment card information with Revolve, on the same terms had they known that Revolve's information systems were inadequate for that purpose.

127. Revolve also knew that disclosing the inadequate condition of, and vulnerabilities in, its information systems would negatively affect Plaintiff's and Class Members' decisions to purchase from Revolve and to save their payment card information with it.

128. Revolve nonetheless failed to disclose the inadequacy of its information systems and the vulnerabilities in them before Plaintiff and Class Members made their purchasing decisions. By withholding that information, Revolve denied Plaintiff and Class Members the ability to make informed purchasing decisions and took undue advantage of them.

129. Revolve retained the benefits Plaintiff and Class Members conferred while failing to provide the reasonable data security that they paid for and reasonably expected, and instead saved the cost of implementing adequate security measures. Plaintiff and Class Members therefore did not receive the benefit of their bargain, because a portion of the price they paid was for reasonable data security that Revolve did not provide.

130. Because Revolve obtained these benefits improperly, it is not legally or equitably entitled to retain them. Under the circumstances, it would be unjust for Revolve to retain those benefits.

131. Plaintiff and Class Members lack an adequate remedy at law to the extent that no enforceable contract governs their relationship with Revolve.

132. Revolve should be compelled to disgorge into a common fund, or to make restitution to Plaintiff and Class Members of, the amounts by which it was unjustly enriched.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of the Class, respectfully requests that the Court enter judgment in Plaintiff's favor and against Defendant, and:

(a) certify this action as a class action under Federal Rule of Civil Procedure 23, define the Class as requested above, appoint Plaintiff as class representative, and appoint Plaintiff's counsel as Class Counsel;

(b) enjoin Defendant from continuing the unlawful conduct alleged above and order Defendant to (1) render all stored payment card numbers unreadable through tokenization, truncation, or encryption; (2) implement bot detection, rate limiting, and multi-factor authentication controls on its e-commerce platform; (3) implement logging and monitoring sufficient to detect automated extraction of customer data; (4) delete payment card information it does not need to retain; (5) engage an independent third-party assessor to audit its compliance with the PCI DSS

annually; and (6) provide Class Members with adequate credit monitoring and identity-protection services;

(c) award Plaintiff and Class Members actual, compensatory, and nominal damages in an amount to be determined at trial;

(d) order restitution and disgorgement of all amounts by which Defendant was unjustly enriched;

(e) award pre-judgment and post-judgment interest at the maximum rate allowed by law;

(f) award reasonable attorney's fees and costs as permitted by law; and

(g) grant such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Under Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury on all claims and issues so triable.

Dated: November 16, 2026 Respectfully submitted,

*/s/Daniel Srourian*
Daniel Srourian (SBN 285678)
**SROURIAN LAW FIRM, P.C.**
468 N Camden Drive, Suite 200
Beverly Hills, CA 90210
Tel: (213) 474-3800
E: daniel@slfla.com

Grayson Wells (*pro hac vice* forthcoming)
**STRANCH, JENNINGS & GARVEY, PLLC**
The Freedom Center
223 Rosa L. Parks Avenue, Suite 200
Nashville, Tennessee 37203
Tel: (615) 254-8801
gwells@stranchlaw.com

*Attorneys for Plaintiff and the Proposed Class*